# IN THE SUPREME COURT OF CALIFORNIA

JORGE LUIS ESTRADA et al.,
Plaintiffs and Appellants,

v.

ROYALTY CARPET MILLS, INC.,
Defendant and Appellant.

S274340

Fourth Appellate District, Division Three
G058397, G058969

Orange County Superior Court
30-2013-00692890

January 18, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

ESTRADA v. ROYALTY CARPET MILLS, INC.

S274340

Opinion of the Court by Guerrero, C. J.

The Courts of Appeal have reached contrary conclusions as to whether trial courts have the inherent authority to strike[1] a Labor Code Private Attorneys General Act of 2004 (PAGA; Lab. Code, § 2698 et seq.)[2] claim on manageability grounds. (Compare *Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 697 (*Estrada*) [concluding that trial courts lack such inherent authority] with *Wesson v. Staples the Office Superstore, LLC* (2021) 68 Cal.App.5th 746, 766–767 (*Wesson*) [concluding that trial courts possess such inherent authority]; see also *Woodworth v. Loma Linda University Medical Center* (2023) 93 Cal.App.5th 1038, 1047, review granted Nov. 1, 2023, S281717 (*Woodworth*) [agreeing with *Estrada* that "trial courts may not strike or dismiss a PAGA claim for lack of manageability"].) We granted review to consider the issue.[3]

---

[1] By "strike," we mean to dismiss with prejudice.

[2] Unless otherwise specified, all subsequent statutory references are to the Labor Code.

[3] After we granted review, the United States Court of Appeals for the Ninth Circuit resolved a similar split among federal district courts applying California law and held, "In light of the structure and purpose of PAGA, we conclude that imposing a manageability requirement in PAGA cases . . . would not constitute a reasonable response to a specific problem and would contradict California law by running

1

We now conclude that trial courts lack inherent authority to strike PAGA claims on manageability grounds. In reaching this conclusion, we emphasize that trial courts do not generally possess a broad inherent authority to dismiss claims. Nor is it appropriate for trial courts to strike PAGA claims by employing class action manageability requirements. And, while trial courts may use a vast variety of tools to efficiently manage PAGA claims, given the structure and purpose of PAGA, striking such claims due to manageability concerns — even if those claims are complex or time-intensive — is not among the tools trial courts possess.[4]

Accordingly, we affirm the Court of Appeal's judgment as that court reached the same conclusion we reach here. (See *Estrada, supra*, 76 Cal.App.5th at p. 697.)[5]

---

afoul of the key features of PAGA actions." (*Hamilton v. Wal-Mart Stores, Inc.* (9th Cir. 2022) 39 F.4th 575, 587 (*Hamilton*); *id.* at p. 590 ["The [manageability] requirement cannot be imposed in PAGA actions under the guise of a court's inherent powers"].)

[4] We disapprove the *Wesson* court's conclusion that "trial courts . . . if necessary, may preclude the use of this procedural device [i.e., a PAGA claim]." (*Wesson v. Staples the Office Superstore, LLC, supra*, 68 Cal.App.5th at p. 767.)

[5] As we explain in part II.E., *post*, we also conclude that defendant Royalty Carpet Mills, Inc. (Royalty) has not demonstrated any potential violation of its right to due process occasioned by the Court of Appeal's reversal of the trial court's striking of plaintiffs' representative PAGA claim. However, we do not decide the hypothetical questions of whether a defendant's right to due process can *ever* support striking a PAGA claim, and if so, the circumstances under which such striking would be appropriate.

## I. FACTUAL AND PROCEDURAL BACKGROUND[6]

Royalty operated two facilities relevant here: one located on Derian Avenue (Derian) and the other on Dyer Road (Dyer) in Orange County. (*Estrada*, *supra*, 76 Cal.App.5th at p. 698.)

Plaintiff Jorge Luis Estrada worked at Derian. (*Estrada*, *supra*, 76 Cal.App.5th at p. 698.) Estrada filed a complaint against Royalty alleging various claims, including one asserting that Royalty violated Labor Code provisions requiring that it provide first and second meal periods,[7] and one seeking PAGA penalties for various alleged Labor Code violations. (*Estrada*, at p. 698.)

Estrada and plaintiff Paulina Medina, a former Royalty employee who worked at Dyer, filed a second amended complaint that realleged Estrada's individual claims as class claims and retained the PAGA claim from the original complaint. (*Estrada*, *supra*, 76 Cal.App.5th at p. 698.) Thereafter, Estrada, Medina, and 11 other plaintiffs filed the operative third amended complaint. (*Id.* at p. 699.) The third amended complaint alleged a total of seven class claims, one

---

[6]    Our factual and procedural background is drawn primarily from the Court of Appeal's opinion. (See *Estrada*, *supra*, 76 Cal.App.5th at pp. 698–703.)

[7]    A California employer must generally provide "a first meal period no later than the end of an employee's fifth hour of work, and a second meal period no later than the end of an employee's 10th hour of work." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1041 (*Brinker*).) In *Brinker*, we clarified that an "employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." (*Id.* at p. 1040.)

which was based on the failure to provide first and second meal periods, and one which sought PAGA penalties for various Labor Code violations, including those related to meal periods. (*Ibid.*)

Several named plaintiffs moved for class certification in June 2017. (*Estrada, supra,* 76 Cal.App.5th at p. 700.) As relevant here, the trial court certified a Dyer/Derian class composed of former nonexempt hourly workers who worked at the two facilities between December 13, 2009, and June 14, 2017. (*Ibid.*) The court also certified three Dyer/Derian subclasses, including a meal period subclass to determine whether "class members were provided timely first meal periods and/or deprived of second meal periods." (*Ibid.*)

The trial court held a bench trial on plaintiffs' claims. Plaintiffs presented "live testimony from 12 of the 13 named plaintiffs, deposition testimony from four different managers and officers of Royalty, live testimony from two of Royalty's human resources employees, and live testimony from an expert witness." (*Estrada, supra,* 76 Cal.App.5th at p. 701.) In defense, Royalty presented testimony from two former employees and an expert witness. (*Ibid.*)

Following the presentation of evidence, the trial court entered an order decertifying the two Dyer/Derian meal period subclasses alleging the first and second meal period violations,[8] on the ground that there were too many individualized issues to

---

[8] The Court of Appeal noted, "Though the court's initial certification order created a single meal period subclass, the court's decertification order appears to treat the first and second meal period issues as two separate subclasses." (*Estrada, supra,* 76 Cal.App.5th at p. 719, fn. 10.) Thus, we refer to these "as separate subclasses." (*Ibid.*)

support class treatment. (*Estrada*, *supra*, 76 Cal.App.5th at p. 702.)[9] In the same order, the trial court dismissed the PAGA claim seeking penalties for the alleged Dyer/Derian meal break-related violations with respect to persons other than the named plaintiffs as being unmanageable. (*Estrada*, at p. 702.)[10] The trial court subsequently entered judgment. (*Estrada*, at p. 703.) Plaintiffs appealed from the decertification order and the judgment. (*Ibid*.)

In the Court of Appeal, plaintiffs claimed that the trial court abused its discretion by decertifying the Dyer/Derian meal period subclasses and erred in dismissing the subclasses' PAGA meal period claims on manageability grounds. (*Estrada*, *supra*, 76 Cal.App.5th at pp. 709–714, 719–727.) The Court of Appeal agreed with plaintiffs on both issues. (*Id*. at pp. 714, 726.) The Court of Appeal reversed the trial court's order that had decertified the Dyer/Derian meal period subclasses and dismissed that portion of the Dyer/Derian PAGA claim based on meal period violations. (*Id*. at p. 731.) The Court of Appeal directed the trial court to hold a new trial on both claims on remand, and added, "[a]s to both, we leave it in the court's discretion to determine whether additional witnesses or other evidence will be allowed in light of the principles set forth in this opinion." (*Ibid*.)

---

[9] In explaining the nature of these individualized issues, the trial court's decertification order noted that "employee choice was a significant factor with respect to taking meal breaks."

[10] However, with one exception, the trial court "found the named Dyer/Derian plaintiffs had established individual PAGA violations" and therefore awarded them penalties. (*Estrada, supra,* 76 Cal.App.5th at p. 703.)

We granted Royalty's petition for review to resolve the issue dividing the appellate courts: whether trial courts have inherent authority to strike a PAGA claim on manageability grounds.

## II. DISCUSSION

Royalty and amici curiae[11] claim that California trial courts have inherent authority to strike PAGA claims on manageability grounds. In support of this assertion, Royalty and amici curiae raise two primary arguments that differ in their conception of the scope of a trial court's inherent authority. Specifically, Royalty and amici curiae argue that a trial court may strike: (1) *any claim* that is unmanageable for reasons of judicial economy; or, at a minimum, (2) *any representative claim* that is unmanageable, as with class claims and representative claims brought under a former version of the unfair competition law (UCL) (Bus. & Prof. Code, former § 17200 et seq.). Royalty also suggests that retrial of the plaintiffs' representative PAGA claim would violate Royalty's right to due process and that trial courts must have discretion to strike PAGA claims in order to preserve the due process rights of defendants generally. After providing an overview of the relevant law, we consider each argument in turn.

---

[11] We have received amicus curiae briefs supporting Royalty from: (1) the Board of Trustees of the California State University; (2) the Employers Group and California Employment Law Counsel; and (3) the Chamber of Commerce of the United States of America, California Chamber of Commerce, National Retail Federation, and Retail Litigation Center, Inc. (Chamber of Commerce).

**A. Governing Law**

We begin with an overview of the three areas of law upon which Royalty's and amici curiae's arguments are primarily based: California courts' inherent authority, the PAGA statute, and the concept of manageability.

### 1. *Courts' Inherent Authority*

This court has identified two primary sources of California courts' inherent authority: "equitable power derived from the historic power of equity courts [citation], and supervisory or administrative powers which all courts possess to enable them to carry out their duties." (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 635 (*Bauguess*).)

These two sources of power have translated into two principal ways in which California courts have exercised their inherent authority, namely: (1) to address gaps in the law by applying procedures contained in related statutory provisions (see, e.g., *People v. Arredondo* (2019) 8 Cal.5th 694, 707 [courts may " ' "create new forms of procedures" in the gaps left unaddressed by statutes and the rules of court' "]; *In re Cook* (2019) 7 Cal.5th 439, 446–447 [courts have inherent authority to apply Pen. Code, § 1203.01 to preserve evidence of youth-related factors for a hearing to be held pursuant to *People v. Franklin* (2016) 63 Cal.4th 261]); and (2) to adopt procedures necessary to perform essential judicial functions (see, e.g., *Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 813 (*Citizens Utilities*) [courts have inherent power to determine the appropriate amount of just compensation for inverse condemnation]; *James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 175 (*James H.*) [courts have the inherent power to determine a minor's mental competence]).

On the other hand, "Courts . . . do not have the authority to adopt procedures or policies that conflict with statutory law . . . ." (*Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 857 (*Weiss*).) " '[I]nherent powers should never be exercised in such a manner as to nullify existing legislation or frustrate legitimate legislative policy.' " (*People v. Municipal Court (Runyan)* (1978) 20 Cal.3d 523, 528 (*Runyan*), italics omitted.)

More specifically, where the Legislature has provided for certain procedures in one context, courts generally lack inherent authority to apply the procedure in an inapposite context. (See *Weiss*, *supra*, 9 Cal.5th at p. 865 [courts lack inherent authority to import certain eminent domain procedures into inverse condemnation actions]; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 137 (*Kraus*) [courts lack inherent authority to "fashion a fluid recovery remedy [in a representative UCL action] when the action has not been certified as a class action" in part because "the Legislature has not expressly authorized monetary relief other than restitution in UCL actions, but has authorized disgorgement into a fluid recovery fund in class actions"]; *Bauguess*, *supra*, 22 Cal.3d at p. 637 ["It would be both unnecessary and unwise to permit trial courts to use fee awards as sanctions apart from those situations authorized by statute"].)

And, with respect to the form of authority at issue here, the power to strike a claim, while "[t]here may be cases in which the use of a nonstatutory motion procedure to dismiss a cause of action before trial is called for, . . . courts should be wary of such requests." (*Weiss*, *supra*, 9 Cal.5th at p. 865.)

2. *PAGA*

In 2003, the Legislature enacted PAGA to remedy "systemic underenforcement" of the Labor Code. (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 (*Williams*).) PAGA provides for civil penalties for various Labor Code violations and authorizes "aggrieved employees, acting as private attorneys general, to recover [those] penalties." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 379 (*Iskanian*) abrogated in part on other grounds in *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. ___ [142 S.Ct. 1906, 213 L.Ed.2d 179] (*Viking River*).) Under the statute, an " 'aggrieved employee' " is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (§ 2699, subd. (c).)

The term " '[a]ggrieved employee' . . . . governs not just who has standing to bring a PAGA claim, but also who may recover a share of penalties." (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 87 (*Kim*).) And a PAGA plaintiff may seek penalties for violations involving aggrieved employees other than the PAGA plaintiff. (*ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 185 (*ZB*).) We have sometimes referred to this as a " 'representative' " (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1118, italics omitted, quoting *Iskanian*, *supra*, 59 Cal.4th at p. 384) or "non-individual" PAGA claim (*Adolph*, at p. 1114).

Civil penalties recovered on a PAGA claim are split between the state and aggrieved employees. (*Iskanian*, *supra*, 59 Cal.4th at p. 382; see § 2699, subd. (i) [75 percent of civil penalties go to state labor law enforcement agency, 25 percent go to aggrieved employees].) "[C]ivil penalties recovered on the

state's behalf are intended to 'remediate present violations and deter future ones,' *not* to redress employees' injuries." (*Kim, supra,* 9 Cal.5th at p. 86.)

"PAGA suits exhibit virtually none of the procedural characteristics of class actions." (*Viking River, supra,* ___ U.S. ___ [142 S.Ct. at p. 1920]; see also *Hamilton, supra,* 39 F.4th at pp. 583, 588 [summarizing distinctions].) "A class-action plaintiff can raise a multitude of claims because he or she represents a multitude of absent individuals; a PAGA plaintiff, by contrast, represents a single principal, the [Labor and Workforce Development Agency] LWDA, that has a multitude of claims." (*Viking River,* 142 S.Ct. at p. 1920.) Thus, because PAGA actions do not adjudicate individually held claims, the due process rights of third parties are not paramount. (*Viking River,* at p. 1921.) While "nonparty employees as well as the government are bound by the judgment" in a PAGA action as to a claim for civil penalties, nonparty employees are not bound with respect to "remedies other than civil penalties." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986–987 (*Arias*).) Moreover, "PAGA does not make other potentially aggrieved employees parties or clients of plaintiff's counsel, does not impose on a plaintiff or counsel any express fiduciary obligations, and does not subject a plaintiff or counsel to scrutiny with respect to the ability to represent a large class." (*Williams, supra,* 3 Cal.5th at pp. 546–547.)

3. *Manageability*

The term "manageability" and variants thereof encompass two related but distinct concepts. First, the term refers generally to the degree to which techniques may be used (both before and during trial) to fairly and efficiently adjudicate an

action. (See, e.g., *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1154 ["defendants raise legitimate concerns regarding the *unmanageability* of claims"], italics added; *Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 778 [stating that an anti-SLAPP motion might provide a way of making the case more " '*manageable*' "], italics added; *City of King City v. Community Bank of Central California* (2005) 131 Cal.App.4th 913, 938 [stating that discovery renders "more *manageable* . . . the points of legal controversy" in an action], italics omitted and added.)

Second, the term "manageability" and its variants may be used more specifically to refer to a factor utilized in determining whether a class may be certified. This factor looks to whether issues pertaining to individual putative class members may be fairly and efficiently adjudicated. Under federal law, manageability refers to the rule that a court consider "the likely difficulties in managing a class action" in determining whether the class action certification requirements of predominance and superiority are met. (Fed. Rules Civ.Proc., rule 23(b)(3)(D), 28 U.S.C.; see *Hamilton, supra,* 39 F.4th at p. 586.)[12]

Similarly, in discussing California law, we have instructed courts to consider the manageability of a class action in determining certification. For example, in *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1 (*Duran*), we stated: "In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. [Citation.] '[W]hether in a given case affirmative defenses

---

[12]    All subsequent references to "Rule 23" and its subparts are to Rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.).

should lead a court to approve or reject certification will hinge on the manageability of any individual issues. [Citation.]' [Citation.] In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Id*. at pp. 28–29.)

## B. Trial Courts Lack Inherent Authority to Strike a PAGA Claim on Manageability Grounds Based on Judicial Economy

Royalty and some amici curiae claim that trial courts have broad inherent authority to strike *any type of claim*, irrespective of its nature, to foster judicial economy. Specifically, Royalty broadly asserts, the power to strike a claim "is . . . an inherent power of the court *in every case*." (Italics added.) According to Royalty, trial courts may exercise such power to strike claims to "preserve judicial resources [and to] prevent trials from becoming excessively complex and time-consuming."

Contrary to Royalty's contention that trial courts possess a broad and general power to dismiss claims in the name of judicial economy, our case law has recognized that the inherent authority of trial courts to dismiss claims is limited and operates in circumstances that are not present here. We explained the limits of a court's "inherent discretionary power to dismiss claims with prejudice" in *Lyons v. Wickhorst* (1986) 42 Cal.3d 911, 915 (*Lyons*). There we explained that the inherent power of a trial court to dismiss claims "has in the past been confined to two types of situations: (1) the plaintiff has failed to prosecute diligently [citation]; or (2) the complaint has been shown to be 'fictitious or sham' such that the plaintiff has no valid cause of

action." (*Ibid*.) In concluding that a trial court lacked inherent authority to dismiss a plaintiff's action for failing to participate in a judicial arbitration proceeding, we emphasized in *Lyons* that "although the discretionary power to dismiss with prejudice has been upheld in this state, its use has been *tightly circumscribed*." (*Id*. at p. 916, italics added; see also 6 Witkin, Cal. Procedure (6th ed. 2023) Proceedings Without Trial, § 329 [citing *Lyons* and stating "[t]he trial court's inherent power to dismiss is circumscribed"].)[13]

Our holding in *Lyons* that trial courts possess only a "tightly circumscribed" inherent power to dismiss with prejudice (*Lyons*, *supra*, 42 Cal.3d at p. 916) is consistent with this court's refusal to recognize even lesser forms of inherent power. For example, in *Bauguess*, we concluded that trial courts lack inherent authority to award attorney fees as a sanction for misconduct, reasoning that it was "unnecessary and unwise to permit trial courts to use fee awards as sanctions apart from those situations authorized by statute." (*Bauguess*, *supra*, 22 Cal.3d at p. 637.) We observed, "If this court were to hold that trial courts have the inherent power to impose sanctions in

---

[13] Royalty relies on *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, where the court held "that when the plaintiff has engaged in misconduct during the course of the litigation that is deliberate, that is egregious, and that renders any remedy short of dismissal inadequate to preserve the fairness of the trial, the trial court has the inherent power to dismiss the action." (*Id*. at p. 764.) But nothing in *Stephen Slesinger* supports a broad inherent judicial power to dismiss a claim to "preserve judicial resources [and to] prevent trials from becoming excessively complex and time-consuming," as Royalty contends. On the contrary, the *Stephen Slesinger* court "emphasize[d] that dismissal is *always* a drastic remedy to be employed *only* in the rarest of circumstances." (*Id*. at p. 764.)

the form of attorney's fees for alleged misconduct, trial courts would be given a power without procedural limits and potentially subject to abuse." (*Id.* at p. 638.)

In sum, there is no inherent authority that sweeps as broadly as Royalty would have us hold. Contrary to Royalty's claim that all courts have *broad* inherent powers to dismiss claims on judicial economy grounds, we held in *Lyons* that trial courts possess only a *narrow* inherent authority to dismiss claims based on limited circumstances undisputedly not present in this case (e.g., cases involving a failure to prosecute, frivolous claims, or egregious misconduct).

None of the cases cited by Royalty or by amici curiae supports the contention that courts have broad inherent authority to strike claims to serve judicial economy. Notably, aside from *Stephen Slesinger*, discussed in footnote 13 *ante*, none of these cases addressed whether a court had the inherent power to strike a claim. (See, e.g., *Cohn v. Corinthian Colleges, Inc.* (2008) 169 Cal.App.4th 523, 531 [considering a court's inherent authority to accept an oral application to expedite discovery prior to a motion for summary judgment]; *Asbestos Claims Facility v. Berry & Berry* (1990) 219 Cal.App.3d 9, 23 [considering a court's inherent power to appoint defense counsel]; *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 289 [discussing a court's inherent power to preclude the presentation of evidence as a sanction for litigation abuse]; *Adamson v. Superior Court* (1980) 113 Cal.App.3d 505, 509 [considering a court's inherent power to grant rehearing]; *James H., supra,* 77 Cal.App.3d at p. 172 [considering a court's inherent power to order a competency hearing for a juvenile]; *Venice Canals Resident Home Owners Assn. v. Superior Court* (1977) 72 Cal.App.3d 675, 680 [discussing a court's inherent

power to require the posting of a bond].) And, in some of the cited cases, this court declined to conclude that the trial court possessed the inherent authority to take the action at issue in the case. (*Bauguess*, *supra*, 22 Cal.3d at p. 638; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [stating " 'trial judges have no authority to issue courtroom local rules which conflict with any statute' or are 'inconsistent with law' "].)

Our cases holding that courts possess some limited amount of inherent authority in other respects do not support Royalty's contention that trial courts possess broad inherent authority to strike a claim for judicial economy reasons. In *Addison v. State of California* (1978) 21 Cal.3d 313, we "appl[ied] the well established doctrine of 'equitable tolling' " (*id.* at p. 316), which we explained had grown from our power to "formulate rules of procedure where justice demands it," to ensure that "technical forfeitures . . . [do not] unjustifiably prevent a trial on the merits" (*id.* at p. 319). And, in *Citizens Utilities*, we upheld a limited inherent power of courts to devise a procedure to assess the value of condemned property as of the date of trial and not merely as of the date of the summons (as provided by statute) after noting that constitutional provisions for the payment of the taking of public property were "self-executing," and that it had "been held, in inverse condemnation cases, that inherent power is reposed in the trial court to provide for the assessment of just compensation in situations not within the purview of existing statutory provisions." (*Citizens Utilities*, *supra*, 59 Cal.2d at p. 812.) This court's formulation of rules of procedure to facilitate the trial of causes on the merits (*Addison*), and to devise a procedure to adjudicate certain claims (*Citizens Utilities*) bear no resemblance to the broad power to

strike a claim for judicial convenience that Royalty and amici curiae argue for here.

Similarly, none of the statutes cited by Royalty and amici curiae reveals the broad inherent authority that Royalty and amici curiae claim trial courts possess. For example, while Royalty cites Code of Civil Procedure sections 128 and 187,[14] neither statute refers to a court's inherent power to strike a claim due to manageability concerns, and Royalty does not offer any argument demonstrating that this sort of power is implied by such statutes.[15]

---

[14] Code of Civil Procedure section 128, subdivision (a) specifies a series of powers that every court possesses, including "[t]o preserve and enforce order in its immediate presence," "[t]o enforce order in the proceedings before it," "[t]o provide for the orderly conduct of proceedings before it," "[t]o compel obedience to its judgments," "[t]o control in furtherance of justice, the conduct of its ministerial officers," "[t]o compel the attendance of persons to testify," "[t]o administer oaths," and "[t]o amend and control its process and orders so as to make them conform to law and justice."

Code of Civil Procedure section 187 provides, "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

[15] Royalty also cites California Standards of Judicial Administration, standard 3.10(a), which provides, "In complex litigation, judicial management should begin early and be applied continuously and actively, based on knowledge of the circumstances of each case." However, this standard neither identifies any inherent authority nor establishes that courts have the power to strike claims to foster judicial management.

The statutes cited by amici curiae are also inapposite. (See Code Civ. Proc., §§ 583.150, 581, subd. (m).) While Code of Civil Procedure section 583.150 states that it "does not limit or affect the authority of a court to dismiss an action or impose other sanctions . . . under inherent authority of the court," that provision does not purport to describe the extent of such inherent authority in any manner. Code of Civil Procedure section 583.150 also pertains to the dismissal of a case for delay in prosecution, which, as discussed *ante*, is one of the narrow grounds upon which courts *do* have inherent dismissal authority.

The other statute cited by amici curiae, Code of Civil Procedure section 581, enumerates specific bases for which a trial court may dismiss an action, complaint, or cause of action. (See, e.g., *id.*, subd. (b)(3) [specifying that action may be dismissed "[b]y the court, without prejudice, when no party appears for trial following 30 days' notice of time and place of trial"].) Code of Civil Procedure section 581, subdivision (m), which amici curiae specifically reference, includes a caveat providing that the provisions of Code of Civil Procedure section 581 are not the exclusive grounds for dismissal.[16] However, neither the statute generally, nor subdivision (m) in particular, confers a broad discretionary power to dismiss upon trial courts. Thus, we are not persuaded that Code of Civil Procedure section 581, subdivision (m) demonstrates that courts possess the inherent authority to strike claims advanced here.

---

[16] Code of Civil Procedure section 581, subdivision (m) provides, "The provisions of this section shall not be deemed to be an exclusive enumeration of the court's power to dismiss an action or dismiss a complaint as to a defendant."

Royalty also offers two hypothetical actions to support its claim that trial courts have inherent authority to strike claims on manageability grounds. Neither hypothetical advances Royalty's argument.

First, Royalty posits a hypothetical case involving a plaintiff who, in a single action, seeks to join multiple claims arising out of different facts, premised on different legal theories, against several different defendants. Royalty asserts that while "[f]acially, there is no bar" against joining such claims in an action, a "court would likely, *sua sponte*, dismiss certain claims and defendants without prejudice" pursuant to its inherent power to manage the action. Contrary to Royalty's assertion, there *is* a bar against the joinder proposed in its hypothetical. Code of Civil Procedure section 379 requires that "*at least one* of the causes of action joined must affect *all* of the defendants." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2021) ¶ 6:269 (Civil Procedure Before Trial).)[17] Thus, a trial court would be authorized to dismiss such unrelated claims against different defendants pursuant to a statute, rather than pursuant to an inherent authority to manage the action.

---

[17] Code of Civil Procedure section 379 provides in relevant part: "(a) All persons may be joined in one action as defendants if there is asserted against them: [¶] (1) Any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if *any question of law or fact common to all these persons will arise in the action*; or [¶] (2) A claim, right, or interest adverse to them in the property or controversy which is the subject of the action." (Italics added.)

Royalty offers a second hypothetical of a plaintiff bringing unrelated claims against the same defendant. Again, Royalty contends that a court could exercise its inherent authority to require that such claims be brought as "separate actions" and that a court could dismiss such claims without prejudice if the plaintiff refused to do so. However, a statute would govern a trial court's joinder determination in this instance as well. Code of Civil Procedure section 1048, subdivision (b) specifically authorizes a trial court to order "a separate trial of any cause of action . . . or of any number of causes of action" in the "furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy."[18]

Royalty contends that its hypotheticals "demolish[] the idea" that courts lack a broad inherent power to dismiss any claim on manageability grounds. However, rather than demonstrating that trial courts possess a freewheeling inherent authority to develop joinder rules for each action they face, Royalty's hypotheticals reveal only that California statutory law provides the applicable procedural rules governing the joinder issues that Royalty presents.

Finally, at oral argument, while Royalty's counsel argued that PAGA cases should "not be treated differently," and that

---

[18] Code of Civil Procedure section 1048, subdivision (b) provides, "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action, including a cause of action asserted in a cross-complaint, or of any separate issue or of any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States."

this court should "leave trial courts . . . with their full toolbox," counsel did not refer to any cases in which courts have recognized a broad inherent power to strike a claim to foster judicial economy. And, as noted *ante*, neither Royalty nor supporting amici curiae have cited in their briefs, nor has our research uncovered, any other circumstance in which we have concluded that trial courts possess such an inherent power to strike a claim. Thus, contrary to Royalty's contention that this case is about "tak[ing] away" a power that trial courts generally possess, Royalty would have this court sanction a broad new power that we have never before recognized. For the reasons discussed above, we decline to do so.

## C. Class Action Manageability Requirements Cannot Be Grafted onto PAGA Claims

We also reject Royalty's narrower argument that trial courts possess the power to dismiss *PAGA claims*, in particular, on manageability grounds — just as they do with class claims.[19]

### 1. *Structural Differences*

We conclude that class claims differ significantly from PAGA claims in ways that make it inappropriate to impose a class action-based manageability requirement on PAGA actions.

First, manageability bears upon questions of superiority and the predominance of common issues, requirements unique

---

[19]   As Royalty puts it, "Just because PAGA suits 'are not class actions' [(*Estrada, supra,* 76 Cal.App.5th at p. 697)] — a statement with which no-one can disagree — does not mean that they are exempt from all requirements that class actions are subject to . . . . There are good reasons why both class actions and PAGA suits can and should be subject to overlapping requirements — such as . . . manageability."

to the class action context.  Under federal law, manageability had its primary origin as a factor in determining whether the Rule 23(b)(3) class action requirements of predominance and superiority have been met.[20]  (See *Hamilton*, *supra*, 39 F.4th at p. 588  ["The  manageability  requirement,  a  subsidiary component of the predominance and superiority inquiries, was thus specifically devised to address concerns arising from the aggregation of individual claims for money damages"]; accord, 7AA Wright et al., Federal Practice and Procedure (3d ed. 2023) Civil, § 1780 [discussing the manageability criterion and its ability to help the court "in determining whether questions of law or fact common to the members of the class predominate"]; 2 Rubenstein, Newberg and Rubenstein on Class Actions (6th ed. 2022) § 4:72 ["The manageability factor 'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit,' " and is "by the far, the most critical concern in determining whether a class action is a superior means of adjudication"].)[21]

---

[20]     Rule 23(b) provides in relevant part:  "A class action may be maintained if Rule 23(a) is satisfied and if:  [¶] . . . [¶]  (3) the court finds that the questions of law or fact common to class members  predominate  over  any  questions  affecting  only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: [¶] . . . [¶]  (D) *the likely difficulties in managing a class action*." (Italics added.)

[21]     Class actions may be brought for purposes other than those enumerated in Rule 23(b)(3), including where prosecuting separate actions would either risk inconsistent adjudications among class members or would substantially impede individual class members' ability to protect their interests (Rule 23(b)(1))

Similarly, under California law, in determining whether a class action may be maintained, courts consider whether common issues predominate and whether a class action is a superior method of adjudication. (See *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913–914 (*Washington Mutual*).) Manageability is considered in connection with such inquiries. (See *Duran*, *supra*, 59 Cal.4th at p. 29 ["In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class"]; Civil Procedure Before Trial, *supra*, ¶ 14:11.10 ["The proponent of class certification must demonstrate that the proposed class action is manageable," which "requires the trial court 'to carefully weigh the respective *benefits and burdens* of a class action, and to permit its maintenance only where substantial benefits will be accrued by both litigants and the courts alike' "].)

In contrast, "an employee's representative action against an employer . . . seeking civil penalties under [PAGA]" need not "satisfy class action requirements." (*Arias*, *supra*, 46 Cal.4th at p. 975.) Specifically, there is no requirement that a plaintiff establish predominance of common issues to state a PAGA claim. (See *Wesson*, *supra*, 68 Cal.App.5th at p. 766.) Likewise, there is no authority suggesting that superiority is a requirement for a representative PAGA action. On the contrary, PAGA is based on the Legislature's intent to maximize the

and where a party is requesting indivisible injunctive or declaratory relief (Rule 23(b)(2)). In the Ninth Circuit, class actions brought under Rule 23(b)(1) or (b)(2) are not subject to a manageability requirement. (*Hamilton*, *supra*, 39 F.4th at p. 588.)

enforcement of labor laws. (*ZB, supra,* 8 Cal.5th at p. 184.) PAGA's legislative history also reveals that the Legislature wanted to seek to "achieve maximum compliance with state labor laws." (*Arias, supra,* 46 Cal.4th at p. 980; see *Wood v. Kaiser Foundation Hospitals* (2023) 88 Cal.App.5th 742, 758 (*Wood*) [explaining that the Legislature was concerned with massive underenforcement of labor laws causing state revenue losses].) A legislative intent to maximize the enforcement of labor laws is in tension with the class action superiority requirement, which requires a court to " ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).)

Thus, we are not persuaded by amici curiae's argument that "if class action plaintiffs cannot manageably prove their claims on a classwide basis, there is no rational basis for allowing PAGA plaintiffs to demand that trial courts try unmanageable PAGA claims." As outlined above, manageability in the class action context is a factor in demonstrating that class-wide issues predominate and that a class action is superior to individual actions. Given that a PAGA plaintiff need not demonstrate that common issues predominate or that a representative or non-individual PAGA claim is superior to other forms of adjudication, the requirement that a plaintiff demonstrate the manageability of a *class* claim does not establish a similar manageability requirement for any related *PAGA* claim.

Further, manageability, when considered as a factor in determining the propriety of class certification, is considered in connection with other factors. (See 2 Rubenstein, Newberg and

Rubenstein on Class Actions, *supra*, at § 4:72 ["the question that courts consider when they analyze manageability is not whether a class action is manageable in the abstract but how the problems that might occur in managing a class suit compare to the problems that would occur in managing litigation without a class suit"].)  However, while a trial court may deny certification or decertify a class if it would not be feasible to manage the individual issues in a class action trial, denial of certification or decertification is not an option for a trial court when adjudicating a PAGA claim.  Further, imposing "a freestanding manageability requirement" as to PAGA claims " 'would invite courts to consider the administrative burdens' of the action 'in a vacuum.' "  (*Hamilton, supra,* 39 F.4th at p. 589.)  In other words, while a manageability determination in the class action context is part of the consideration of the costs and benefits of class adjudication as opposed to other methods for resolving the controversy (*Briseno v. ConAgra Foods, Inc.* (9th Cir. 2017) 844 F.3d 1121, 1128), to apply a separate manageability requirement in the PAGA context apart from a consideration of any other factors that might favor representative litigation would be to apply the manageability criterion in a way it does not apply in the class action context.  And, applying a manageability requirement in such a unidirectional fashion in the PAGA context could predictably lead to "the dismissal of many PAGA cases" (*Hamilton*, at p. 589) in contravention of the Legislature's intent to have the statute maximize the enforcement of labor laws (see *ZB, supra,* 8 Cal.5th at p. 184).

In this case, the trial court ruled that the Dyer and Derian meal break subclasses had to be decertified because "Plaintiffs fail to satisfy their burden to establish commonality or predominance."  Then, notwithstanding that commonality and

predominance are not PAGA requirements, the trial court summarily concluded, "The meal break-related claims that Plaintiffs bring for the Dyer and Derian locations under [PAGA], are also dismissed because, for the various reasons noted above, there are numerous individualized issues that render Plaintiffs' PAGA meal break claims unmanageable." We reject a rule that would likely result in courts relying on *class action* manageability determinations in striking *PAGA* claims, even where the primary factors driving the class manageability determination (e.g., predominance and superiority) have no applicability in the PAGA context.

Our decision in *Williams* did not impose a manageability requirement on PAGA actions. While in *Williams* we stated that a PAGA plaintiff's ability to offer evidence of uniform policies "is one way a plaintiff might seek to render trial of the action *manageable*" (*Williams*, *supra*, 3 Cal.5th at p. 559, italics added), we did not hold that a court could *strike* a PAGA claim for manageability reasons. Rather, *Williams* stands for the unremarkable proposition that trial participants should endeavor in all cases (including PAGA cases) to ensure that a case is efficiently adjudicated. We unequivocally endorse that proposition. However, stating that all trial participants must endeavor to fairly and efficiently adjudicate an action is distinct from concluding that trial courts may strike a PAGA claim for manageability reasons. (See *ante,* at p. 10 [noting that the "term 'manageability' and variants thereof encompass two related but distinct concepts"].) While trial courts shall endeavor to efficiently manage PAGA cases, just as they must manage *any* complex case, it makes little sense to impose a class action manageability requirement on PAGA claims when such a

requirement is relevant to the class certification procedure but has no applicability to a PAGA claim.

Second, unlike class claims, PAGA claims are effectively administrative enforcement actions, and imposing a manageability requirement would impede the effectiveness of such actions. "Hurdles that impede the effective prosecution of representative PAGA actions undermine the Legislature's objectives." (*Williams, supra*, 3 Cal.5th at p. 548; see also *Kim, supra*, 9 Cal.5th at p. 89 ["the very reason the Legislature enacted PAGA was to enhance enforcement of provisions punishable only through government-initiated proceedings"].)

Royalty contends that such reasoning "overlooks the very different incentives that exist in privately-brought PAGA actions as compared to LWDA enforcement actions." Specifically, Royalty maintains that PAGA's one-way attorney fees provision incentivizes plaintiffs' lawyers to bring PAGA claims in ways that differ from "a state agency with 'scarce resources [for] an investigation.' " We are not persuaded by this reasoning, which focuses on the wisdom of PAGA's attorney fees provision — a concern better addressed to the Legislature.[22]

---

[22] Differences of opinion regarding PAGA's attorney fees provision are not new. (See Simmons et al., California Private Attorneys General Act (PAGA) Litigation and Compliance Manual (Cont.Ed.Bar. 3d ed. 2023) § 1.2 [discussing PAGA's attorney fees provision and stating, "The perception of PAGA thus varies based on the prism through which it is examined"]; compare Deutsch et al., *California's Hero Labor Law: The Private Attorneys General Act Fights Wage Theft and Recovers Millions from Lawbreaking Corporations* (Feb. 1, 2020) UCLA Labor Center Rep., p. 7 ["PAGA expands enforcement capacity

Third, unlike with class actions, a court's authority to provide relief under PAGA is subject to specific statutory provisions that make it inappropriate to impose a manageability requirement on PAGA claims.

Specifically, section 2699, subdivision (e)(1) links a court's authority to "assess a civil penalty" to the LWDA's authority to "assess a civil penalty" by specifying that a court's authority is "subject to the same limitations and conditions" as those placed upon the LWDA.[23] We are aware of no authority that imposes a manageability limitation on the LWDA's authority to assess a civil penalty. Thus, the text of section 2699, subdivision (e)(1) further supports our conclusion that a PAGA plaintiff should not

_____

by tapping the expertise of private attorneys and increasing California Labor Code compliance"] <https:// www.labor.ucla.edu/wp-content/uploads/2020/02/UCLA-Labor-Center-Report_WEB.pdf> [as of January 18, 2024] with Simmons et al., *California Private Attorneys General Act* (*PAGA*) *Litigation and Compliance Manual*, *supra*, Preface ["plaintiffs are able to leverage PAGA's one-way attorney's fee provision and penalty structure to their advantage because they have no concern regarding an adverse fee award," and "[a]s a result, many employers encounter pressure to settle PAGA cases, even when they believe they have done nothing wrong, because they wish to avoid the substantial costs of defending litigation that presents a risk of paying both sides' attorney's fees"].) This internet citation is archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.

[23] Section 2699, subdivision (e) provides in relevant part: "(1) For purposes of this part, whenever the Labor and Workforce Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, has discretion to assess a civil penalty, a court is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty."

be subject to such a requirement when it seeks a penalty on the LWDA's behalf.

We are not persuaded by amici curiae's argument that section 2699, subdivision (e)(1) should be interpreted to "mean that if the LWDA has discretion to not take enforcement action after investigation, then trial courts have discretion to do so as well." (Citing *Painting & Drywall Work Preservation Fund, Inc. v. Aubry* (1988) 206 Cal.App.3d 682, 687 ["the Labor Commissioner has discretion to determine which investigations to conduct"].) The judicial and administrative authority that is linked in section 2699, subdivision (e)(1) is discretion in "assess[ing] a civil penalty." While courts and the LWDA share discretion in *assessing a civil penalty*, amici curiae point to nothing in PAGA's text or legislative history suggesting courts have the power to shape which cases can be *investigated and enforced*. These types of enforcement decisions are matters within the LWDA's discretion, not that of the courts. The fact that LWDA can exercise a form of prosecutorial discretion in determining whether to take enforcement action does not mean that courts can exercise judicial power to strike a PAGA claim on manageability grounds. We decline to interpret section 2699, subdivision (e)(1) in such a counterintuitive fashion.

In sum, these three structural differences between class actions and PAGA claims support the conclusion that importing the class action manageability requirement into the PAGA context would be improper because it would " 'frustrate legitimate legislative policy.' " (*Runyan, supra,* 20 Cal.3d at p. 528, italics omitted.)

## 2. *Differing Jurisprudential Histories*

The differing jurisprudential histories of class actions and PAGA claims also support application of a manageability requirement as to the former but not the latter. (See *Kraus, supra,* 23 Cal.4th at p. 138 [recognizing that the jurisprudential basis of an action is an important characteristic in determining the scope of a court's inherent powers in stating that "because a UCL action is one in equity," the court could "decline to entertain the action as a representative suit"].)[24]

We have previously described Code of Civil Procedure section 382 as "authorizing" class actions. (*Arias, supra,* 46 Cal.4th at p. 978.) However, the history of class actions in California is considerably more complicated. Code of Civil Procedure section 382 "is based upon the equitable doctrine of virtual representation which ' "rests upon considerations of necessity and paramount convenience, and was adopted to prevent a failure of justice." ' " (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 703–704 (*Daar*); see *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 266 (*Hernandez*) [stating that "[t]he class action is codified in [Code of Civil Procedure] section 382," and "is a product of the court's equitable jurisdiction that rests on considerations of necessity, convenience, and the belief that in large cases, the class action will prevent a failure of justice"].)

---

[24] Thus, we are not persuaded by *Wesson*'s suggestion that the adoption of a manageability requirement in the class action context — notwithstanding the fact that "Code of Civil Procedure section 382 . . . contains no such requirement" — supports imposing a manageability requirement as to PAGA claims. (*Wesson, supra,* 68 Cal.App.5th at p. 764.)

As the Court of Appeal in *Farrar v. Franchise Tax Bd.* (1993) 15 Cal.App.4th 10 observed, "Its general but limited codification in Code of Civil Procedure section 382 notwithstanding, the class action retains the essence of its origins as an invention of equity. [Citations.] Our Supreme Court has reinforced this heritage by urging trial courts to adopt flexible and innovative procedures from common law sources and analogous statutes." (*Id.* at p. 17, fn. omitted; cf. *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1084 (*Fireside Bank*) ["As class actions are originally creatures of equity [citation], so the rules for administering them must be equitable"].)

The common law equitable basis of class actions in California explains why this state's class action jurisprudence has not been limited by the literal terms of Code of Civil Procedure section 382. As Justice Werdegar observed in her concurrence in *Arias*, "[Code of Civil Procedure] section 382 . . . says nothing about [several] important requirements such as the existence of common questions of law, the typicality of claims, the ability of the named plaintiff to provide fair and adequate representation, the superiority of a class action over other methods of adjudication, *the likely difficulties of managing a class action*, and the requirement of notice."[25] (*Arias, supra*, 46 Cal.4th at p. 989, fn. 3 (conc. opn. of Werdegar, J.), italics added.)

---

[25] Code of Civil Procedure section 382 provides in full, "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is

In addition, Code of Civil Procedure section 382 contains but a single sentence that provides scant legislative guidance regarding the multitude of procedural questions that arise in such complex actions.[26] The statute's brevity, when considered in light of the inherent complexities of class suits, supports the need for courts to exercise inherent authority in this context. (See, e.g., *Weiss*, *supra*, 9 Cal.5th at p. 863 [stating that trial courts' inherent authority " ' "arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function" ' "].)

Unlike class actions, PAGA actions are not "originally creatures of equity" (*Fireside Bank*, *supra*, 40 Cal.4th at p. 1084), and PAGA does not "codif[y]" a preexisting common law equitable doctrine (*Hernandez*, *supra*, 4 Cal.5th at p. 266; cf. *LaFace*, *supra*, 75 Cal.App.5th at p. 400 [concluding that

---

one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

Even when this single sentence *does* provide apparently clear answers, we have concluded that such text does not necessarily govern class action procedure. For example, notwithstanding Code of Civil Procedure section 382's use of the disjunctive term "or," this court explained that "[a]lthough the statute [Code of Civil Procedure section 382] appears to speak in the alternative, it uniformly has been held that two requirements must be met in order to sustain any class action: (1) there must be an ascertainable class [citations]; *and* (2) there must be a well defined community of interest in the questions of law and fact involved affecting the parties to be represented." (*Daar*, *supra*, 67 Cal.2d at p. 704, italics added.)

[26] The Judicial Council has adopted rules governing some aspects of class action procedure. (See Cal. Rules of Court, rule 3.760 et seq.)

PAGA is "unlike any pre-1850 common law action"]). The statute and the rights it creates have been described as unique.[27] And, in contrast to the inexhaustive nature of Code of Civil Procedure section 382, the Legislature provided comparatively detailed statutory requirements for maintaining a PAGA claim. (See Lab. Code, §§ 2699, 2699.3.) Manageability, however, is not one of the requirements and we see little reason to presume that the Legislature would intend for courts to have broad extra-statutory inherent authority to strike PAGA claims that the Legislature has itself authorized. "[A]s a general practice, we leave to the Legislature the adoption and amendment of statewide rules governing trial court proceedings." (*Weiss, supra,* 9 Cal.5th at p. 857.)

Further, under PAGA, "[e]mployees who were subjected to at least one unlawful practice have standing to serve as PAGA representatives even if they did not personally experience each and every alleged violation" (*Kim, supra,* 9 Cal.5th at p. 85) and a PAGA plaintiff may seek to recover civil penalties from an employer based on violations committed against the plaintiff and other employees without demonstrating that the violations stem from a uniform policy (*Williams, supra,* 3 Cal.5th at p. 559). Thus, our precedent makes clear that PAGA permits a plaintiff to have representational standing to seek penalties on behalf of individuals who have allegedly suffered violations that vary widely in nature. To permit the striking of such claims merely because they require individual determination would

---

[27]    For example, one Court of Appeal observed that there are "some unique aspects to the PAGA agency relationship." (*Wood, supra,* 88 Cal.App.5th at p. 753, fn. 8.) PAGA penalties have also been described as "unique." (*Provost v. YourMechanic, Inc.* (2020) 55 Cal.App.5th 982, 991.)

deprive the State of the very remedy the Legislature has authorized and would thereby defeat the purpose of the statute. This too supports the conclusion that courts lack the inherent power to strike PAGA claims on manageability grounds. (See *Weiss*, *supra*, 9 Cal.5th at p. 857 [courts lack inherent authority to act in ways that conflict with statutes].) In addition, the Legislature's choice to authorize civil penalties rather than damages for a PAGA violation may help to lessen the manageability concerns inherent with these actions. For although some individualized assessment is required to determine whether a violation occurred and the number of aggrieved employees, a PAGA penalty is not keyed to the degree or quality of an individual's injury, as is often the case with a damages remedy. (See § 2699, subd. (f).)

Class actions and PAGA actions also differ with respect to the relevance of federal law. California class action jurisprudence has long looked to federal law. (See, e.g., *Brinker*, *supra*, 53 Cal.4th at p. 1021 ["Drawing on . . . federal precedent, we have articulated clear requirements for the certification of a class"]; *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 318 ["This is demonstrated by federal law, to which we look when seeking guidance on issues of class action procedure"]; *Washington Mutual*, *supra*, 24 Cal.4th at p. 922 ["we may look to the procedures governing federal class actions under [Rule 23] for guidance"]; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 821 ["In the event of a hiatus, [Rule 23] prescribes procedural devices which a trial court may find useful"].) And federal class action law contains an *express* manageability requirement for Rule 23(b)(3) actions that instructs courts to consider "the likely difficulties in managing a class action." (Rule 23(b)(3)(d).)

In contrast, there is no federal PAGA analogue. Rather, PAGA case law is exclusively rooted in the application of our Legislature's enactment, which, as noted above, lacks a manageability requirement.

In sum, class action requirements, including manageability, developed in large measure from California courts' assertion of their inherent *equitable* powers as informed by federal law. In contrast, a PAGA claim is a pure *statutory* claim arising under California law. This differing doctrinal basis for class and PAGA actions serves as an additional reason to conclude that trial courts lack inherent authority to impose a manageability requirement in PAGA actions.

For all these reasons, we conclude the Court of Appeal properly determined that a trial court's authority to limit *class* claims on manageability grounds does not support the conclusion that trial courts also possess inherent authority to strike *PAGA* claims on manageability grounds.

### D. Representative UCL Claims Are Inapposite

Royalty and amicus curiae Chamber of Commerce claim that appellate courts have recognized that trial courts have the broad inherent authority to strike pre-2004 UCL representative

claims,[28] and that courts have similar inherent authority to strike PAGA claims.[29] We are not persuaded by this argument.

Like class actions, but unlike PAGA claims, the right to bring a pre-2004 UCL representative claim arose out of courts' exercise of their inherent equitable powers. Specifically, in *People v. Superior Court* (*Jayhill Corp.*) (1973) 9 Cal.3d 283, this court concluded that courts had inherent equitable powers to award restitution as ancillary relief in an action seeking an injunction under the UCL as it then existed. (See *Jayhill Corp.*, at p. 286 ["In particular, in an action by the Attorney General under [Business and Professions Code] section 17535 a trial court has the inherent power to order, as a form of ancillary relief, that the defendants make or offer to make restitution to the customers found to have been defrauded"].)

In *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, we recognized that a trial court also had the concomitant power to decline to exercise such inherent powers to permit a non-class representative UCL action and could

---

[28]    By "pre-2004 UCL representative claims," we refer to representative claims brought under a former version of the UCL that were *not* class actions. In 2004, the voters enacted Proposition 64 and amended the UCL to require that "private plaintiffs bringing representative actions comply with class actions procedures and requirements developed under Code of Civil Procedure section 382." (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1092, citing *Arias, supra*, 46 Cal.4th at pp. 977–980.)

[29]    While Royalty alludes to this argument by citing one case involving a pre-2004 UCL representative claim, *South Bay Chevrolet v. Gen. Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861 (*South Bay*), the Chamber of Commerce's amicus curiae brief fully develops the argument.

instead require the case to "proceed[] as a class action." (*Fletcher*, at p. 454.) We explained, "Before exercising its discretion, the trial court must carefully weigh both the advantages and disadvantages of an individual action against the burdens and benefits of a class proceeding for the underlying suit."[30] (*Ibid.*; see also *Kraus*, *supra*, 23 Cal.4th at p. 138 ["We note, moreover, that, because a UCL action is one in equity, in any case in which a defendant can demonstrate a potential for harm or show that the action is not one brought by a competent plaintiff for the benefit of injured parties, the court may decline to entertain the action as a representative suit"].)

Thus, in considering whether to permit pre-2004 UCL representative claims, courts were free to exercise their inherent equitable powers without concern about unduly truncating legislative power authorizing such claims. In contrast, as already explained, the right to bring a statutory claim under PAGA is not rooted in a court's inherent equitable powers.[31] Rather, the private right of action provided in PAGA was specifically authorized by the Legislature to counter systematic underenforcement of labor laws. Thus, the jurisprudential history that serves as the basis for exercising judicial inherent

---

[30] Such requirement closely parallels the superiority requirement in our class action jurisprudence. (See *Linder*, *supra*, 23 Cal.4th at p. 435 [trial courts are required to " ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts" ' "].)

[31] In *LaFace*, the Court of Appeal concluded that there is no right to a jury trial in a PAGA action, in part, because it is equitable in nature. (*LaFace*, *supra*, 75 Cal.App.5th at p. 402.) However, *LaFace* does not suggest that a PAGA action arose from the courts' exercise of their inherent equitable powers.

powers with respect to pre-2004 UCL representative claims is lacking for PAGA claims.[32]

### E. Royalty Has Not Demonstrated Any Potential Violation of Its Right to Due Process, and We Decline To Decide Any Hypothetical Due Process Claims Not Presented in This Case

Royalty's brief also could be read to raise the claim that the retrial of the plaintiffs' representative PAGA claim mandated by the Court of Appeal will violate its right to due process. We are unpersuaded.

Royalty argues that defendants, including employers in class or representative actions, have a due process right to present an affirmative defense. (Citing *Duran, supra*, 59 Cal.4th at p. 33.) We agree. In discussing class actions in *Duran*, we said that "defendants must have an opportunity to present proof of their affirmative defenses." (*Id.* at p. 38.) There

---

[32] At oral argument, counsel for amicus curiae Chamber of Commerce noted that the *Wesson* court perceived *South Bay, supra*, 72 Cal.App.4th 861, a decision involving a pre-2004 UCL representative claim, as persuasive authority regarding the PAGA issue before us. We conclude otherwise. In *South Bay*, the Court of Appeal upheld a trial court's exercise of its inherent equitable powers in determining a plaintiff car dealership had failed to show that the harm the defendant allegedly had caused was "sufficiently uniform" to support adjudication in a representative action under the UCL. (*South Bay*, at p. 897.) However, since a "uniform policy . . . is *not* a condition" of a statutory claim under PAGA (*Williams, supra*, 3 Cal.5th at p. 559, italics added), the significance that the *South Bay* court accorded to the lack of a "sufficiently uniform" harm makes that decision inapposite. (*South Bay*, at p. 897.) Accordingly, we conclude that the *Wesson* court's reliance on *South Bay*, echoed by Royalty (see fn. 29, *ante*) and amicus curiae, is unpersuasive.

is no reason to think defendants have lesser due process rights in defending against representative PAGA claims.

However, we reject Royalty's and amici curiae's suggestion that a defendant's right to present an affirmative defense as recognized in *Duran, supra,* 59 Cal.4th at page 27, carries with it a concomitant right to present the testimony of an unlimited number of individual employees in support of such affirmative defense. Indeed, in *Duran,* immediately after stating that "defendants must have an opportunity to present proof of their affirmative defenses," we added that such adjudication is to occur "within whatever method the court and the parties fashion to try these issues." (*Id.* at p. 38.)

In fact, we suggested that class action defendants do "*not* have an unfettered right to present individualized evidence in support of a defense." (*Duran, supra,* 59 Cal.4th at p. 34, italics added.) We also added, "No case, to our knowledge, holds that a defendant has a due process right to litigate an affirmative defense as to each individual class member." (*Id.* at p. 38.) Further, we emphasized that courts may exercise discretion regarding how to adjudicate such defenses, so long as the defendant is permitted "to introduce its own evidence, both to challenge the plaintiffs' showing and to reduce overall damages." (*Ibid.*) In particular, if plaintiffs seek to prove their claims using a statistical model, we explained that the defendant "must be given a chance to impeach that model or otherwise show that its liability is reduced." (*Ibid.*)

Royalty fails to demonstrate why these limitations on the right to present an affirmative defense in class actions do not also apply to the defense of representative PAGA claims. Accordingly, we reject Royalty's and amici curiae's contention

that certain affirmative defenses to representative PAGA claims *require* the testimony of nearly all alleged aggrieved employees in a case. We further reject their contention that to limit the presentation of individual employees' testimony in such cases necessarily amounts to an abridgment of the meaningful right to present an affirmative defense and a violation of an employer's right to due process under *Duran*.

In light of these principles, we are unpersuaded by Royalty's suggestion that retrial of plaintiffs' representative PAGA claim would violate its right to due process. Royalty argues that "where determining whether employees' late or missed meal periods were violations of the Labor Code will require testimony from each one, the Court of Appeal's only response is 'limit witness testimony and other forms of evidence.' [Citation.] This will deprive the PAGA defendant of any meaningful ability to present the affirmative defense that the employee group whom the plaintiff is representing (or many individuals within it) are not 'aggrieved' within the meaning of the statute."

In this case, however, it bears emphasis that Royalty presented the testimony of just two former employees and one expert witness at the initial trial. The trial court did not prohibit Royalty from calling additional witnesses. It was only *after* the presentation of evidence at trial that the trial court struck the plaintiffs' representative PAGA claim.[33] Under these

---

[33] As noted in part I, *ante*, the Court of Appeal stated that the trial court had discretion whether to allow "additional witnesses or other evidence" on remand. (*Estrada, supra*, 76 Cal.App.5th at p. 731.) Royalty raises no claim in this court as to this aspect of the Court of Appeal's disposition.

circumstances, Royalty has not established that it has a due process right to present the individual testimony of each allegedly aggrieved employee. And it has not established that the retrial of plaintiffs' representative PAGA claim would violate its right to due process by failing to permit such testimony.[34]

Royalty and amici curiae also appear to raise the broader claim that trial courts have inherent authority to strike a PAGA claim to protect a defendant's due process rights generally. While certain characteristics of some PAGA claims, occasioned by the statute's broad standing rules and the lack of need for common proof or class certification, may present trial courts with challenges in ensuring that a defendant's due process rights are preserved, we express no opinion as to the hypothetical questions of whether, and under what circumstances, a defendant's right to due process might ever support striking a PAGA claim.

We also emphasize that trial courts have numerous tools that can be used to manage complex cases generally, and PAGA cases in particular, that do not involve striking a PAGA claim. All of those case management tools remain undisturbed by our decision in this case.[35] To that end we note that the Judicial

---

[34] By the same token, plaintiffs also do not have an unfettered right to present an unlimited number of witnesses. Indeed, in the Court of Appeal below, it was plaintiffs who claimed that the trial court had erred in refusing to allow them to call all their proposed witnesses with respect to the Dyer/Derian meal period subclasses.

[35] We have concluded that *manageability* is an improper basis upon which to strike a PAGA claim and that any striking

Council has described many of the tools that courts may use in managing discovery, other pretrial proceedings, and the trial of complex cases, including cases involving PAGA claims. (See generally Judicial Council of Cal., Deskbook on the Management of Complex Civil Litigation (2016) (Deskbook); see *id*. at ch. 5.I. [discussing PAGA litigation].)[36]

Indeed, in cases involving many employees or distinct types of violations over a long period of time or in different locations, the adjudication of PAGA claims may benefit from evidence other than, or in addition to, individual testimonies. With respect to the alleged Labor Code violation at issue in this case, we have recently held that, when adjudicating the affirmative defense of waiver to a meal break claim in the class action context, " 'Representative testimony, surveys, and statistical analysis,' along with other types of evidence, 'are available as tools to render manageable determinations of the extent of liability.' (*Brinker*, *supra*, 53 Cal.4th at p. 1054 (conc. opn. of Werdegar, J.).)" (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 77 (*Donohue*).)[37]

---

of a PAGA claim to protect a defendant's *due process* right would derive from a narrow authority of last resort to protect a constitutional right rather than the broad discretionary authority recognized by the *Wesson* court.

[36] Among the sources that the Deskbook cites is the Federal Judicial Center's Manual for Complex Litigation, Fourth Edition (2004). (See, e.g., Deskbook, *supra*, § 2.03.) This 786-page treatise contains numerous case management techniques for complex cases. We express no opinion regarding the use of these techniques in any particular case.

[37] In *Donohue*, which we decided after the trial court decertified the Dyer/Derian meal period subclasses (see

Such tools may also be used to help efficiently adjudicate PAGA cases, including affirmative defenses to alleged PAGA violations. Indeed, given that the purpose of the recovery of civil penalties in a PAGA action is to " 'remediate present violations and deter future ones' " rather than to "redress employees' injuries" (*Kim, supra*, 9 Cal.5th at p. 86), statistical methods "designed to reveal generalized characteristics of a population" seem particularly appropriate for use in adjudicating such claims. (*Duran, supra*, 59 Cal.4th at p. 55 (conc. opn. of Liu, J.).) In other words, evidence that reveals the "generalized characteristics" of a population (*ibid.*) may be useful to estimate the number of aggrieved employees, even if such evidence cannot demonstrate the extent of any particular injury.

We also emphasize that our holding that trial courts lack inherent authority to strike a PAGA claim on manageability grounds does not preclude trial courts from limiting the types of evidence a plaintiff may present or using other tools to assure that a PAGA claim can be effectively tried. (See *Estrada, supra,* 76 Cal.App.5th at p. 713 ["courts may, where appropriate and within reason, limit witness testimony and other forms of evidence when determining the number of violations that occurred and the amount of penalties to assess"]; *Woodworth, supra,* 93 Cal.App.5th at p. 1070, review granted [courts "may

---

*Estrada, supra,* 76 Cal.App.5th at p. 719), we concluded that "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations at summary judgment." (*Donohue, supra*, 11 Cal.5th at p. 74.) The Court of Appeal in this case "reverse[d] the [trial] court's decertification order [as to the Dyer/Derian meal period subclasses] and remand[ed] this case so these claims may be retried in light of the *Donohue* presumption." (*Estrada*, at p. 719.)

limit the evidence to be presented at trial or otherwise limit the scope of the PAGA claim, but they may not strike the claim altogether"].)[38]

In addition, as the Court of Appeal observed, since the plaintiff has the burden of proving a PAGA claim and the trial court may limit the presentation of evidence, it behooves the PAGA plaintiff to ensure that trial of the action is manageable so the maximum number of potential violations may be established. (See *Estrada, supra,* 76 Cal.App.5th at p. 713 [noting that a trial court's power to limit the presentation of evidence may "encourage plaintiffs' counsel to be prudent in their approach to PAGA claims and . . . ensure they can efficiently prove alleged violations to unrepresented employees," since "[i]f a plaintiff alleges widespread violations of the Labor Code by an employer in a PAGA action but cannot prove them in an efficient manner, it does not seem unreasonable for the punishment assessed to be minimal"].)

And, of course, a trial court may issue substantive rulings, including those on demurrer, or on motions for summary judgment or judgment notwithstanding the verdict, provided for in the Code of Civil Procedure to fairly and efficiently adjudicate an action in cases in which a plaintiff pleads the claim in such an overbroad or unspecific manner that the plaintiff is unable to prove liability as to all or most employees.[39]

---

[38] Plaintiffs also acknowledge that "the trial court is not powerless to manage the entire *Estrada* action, including the PAGA claims."

[39] Our discussion of the types of tools that a trial court may use to manage a PAGA claim is illustrative rather than exhaustive.

In sum, Justice Tobriner once said that "[n]o class action is inherently unmanageable," because "a court always has access to a variety of techniques" to render the action manageable, and "[t]he critical question . . . is whether the techniques necessary to render . . . [the] action manageable are unconstitutional, or so distort the values a particular cause of action is meant to further that class suit would be improper." (*Blue Chip Stamps v. Superior Ct.* (1976) 18 Cal.3d 381, 390, fn. 3 (conc. opn. of Tobriner, J.).)  The same is true with PAGA claims.  Trial courts face the sometimes difficult task of employing case management techniques in a way that preserves the parties' statutory and constitutional rights.[40]  For the reasons we have explained *ante*, striking a PAGA claim on manageability grounds alone, as the trial court did in this case, is inconsistent with a plaintiff's statutory right to bring such a claim and is beyond a trial court's inherent authority.  And while we do not foreclose the possibility that a defendant could demonstrate that a trial court's use of case management techniques so abridged the defendant's right to present a defense that its right to due process was violated, that showing has not been made here.[41]

---

[40]  In considering the potentially large amount of judicial resources that it may take to manage a single representative PAGA action, one must also bear in mind that such action may reduce the judicial resources that would otherwise be expended to manage many individual PAGA claims and prevent the underenforcement of California law.

[41]  Similarly, it may also be possible for a plaintiff to demonstrate that the use of such case management techniques so abridged the right to present the plaintiff's case that the trial court will have erred.  However, we have no occasion to address this issue in this case.

## F. Conclusion

We acknowledge the challenges presented by complex cases, including representative PAGA actions, and we leave undisturbed various case management tools designed to ensure that these cases are efficiently, fairly, and effectively tried. Nonetheless, there are limits to a trial court's discretion when determining how to balance the interests of the parties before it. We hold that the Court of Appeal properly concluded that a trial court "cannot dismiss a PAGA claim based on manageability." (*Estrada, supra,* 76 Cal.App.5th at p. 709.) Accordingly, we further conclude that the Court of Appeal properly reversed the trial court's order dismissing, on manageability grounds, that portion of the plaintiffs' Dyer/Derian PAGA claim based on meal period violations and properly remanded for a new trial on this claim. (*Id.* at p. 731.)

## III. DISPOSITION

We affirm the Court of Appeal's judgment.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Estrada v. Royalty Carpet Mills, Inc.

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 76 Cal.App.5th 685
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S274340
**Date Filed:** January 18, 2024

---

**Court:** Superior
**County:** Orange
**Judge:** Randall J. Sherman

---

**Counsel:**

Ginez, Steinmetz & Associates, Rudy Ginez, Jr.; CE Smith Law Firm and Clifton E. Smith for Plaintiffs and Appellants.

Baker & Hostetler, Joseph L. Chairez, Daniel F. Lula, Vartan S. Madoyan, Joseph S. Persoff, David B. Rivkin, Jr., and Andrew M. Grossman for Defendant and Appellant.

Shaw Koepke & Satter and Jens B. Koepke for Board of Trustees of the California State University as Amicus Curiae on behalf of Defendant and Appellant.

Munger, Tolles & Olson, Malcolm A. Heinicke, Katherine M. Forster and Minkee Sohn for Chamber of Commerce of the United States of America, California Chamber of Commerce, National Retail Federation and Retail Litigation Center Inc. as Amici Curiae on behalf of Defendant and Appellant.

DLA Piper, Julie Dunne and Matthew Riley for Employers Group and California Employment Law Counsel as Amici Curiae on behalf of Defendant and Appellant.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Clifton E. Smith
CE Smith Law Firm
1117 Village Drive
Oceanside, CA 92057
(760) 754-5472

Daniel F. Lula
Baker & Hostetler LLP
600 Anton Boulevard, Suite 900
Costa Mesa, CA 92626
(714) 966-8890

Malcolm A. Heinicke
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
(415) 512-4029